UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
CHARLES SCATOLA,

                Plaintiff,

     - against -

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-3182 (PKC)

PAMELA K. CHEN, United States District Judge:

Plaintiff Charles Scatola brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's claim for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Before the Court are the parties' cross-motions for judgment on the pleadings. Plaintiff requests that the decision of the Commissioner be reversed solely for an award of benefits or, in the alternative, remanded for further administrative proceedings. For the reasons that follow, the Court grants Plaintiff's motion for judgment on the pleadings, denies the Commissioner's cross-motion, and remands this matter for further administrative proceedings.

## BACKGROUND

### I. Procedural History

On December 29, 2015, Plaintiff filed applications for DIB and SSI, alleging disability beginning on June 1, 1998. (Administrative Transcript ("Tr."),[1] Dkt. 8, at 15.) On March 11,

---

[1] Page references prefaced by "Tr." refer to the continuous pagination of the Administrative Transcript (appearing in the lower right corner of each page) and not to the internal pagination of the constituent documents or the pagination generated by the Court's CM/ECF docketing system.

2016, Plaintiff's applications were initially denied. (*Id.*) On May 17, 2016, Plaintiff filed a request for a hearing before an administrative law judge ("ALJ"). (*Id.*) On March 14, 2018, Plaintiff appeared with counsel before ALJ Gloria Pellegrino. (*Id.* at 40–101.) In a decision dated April 26, 2018, the ALJ determined that Plaintiff was not disabled under the Social Security Act (the "Act") and was not eligible for DIB or SSI. (*Id.* at 12–31.) On April 3, 2019, the ALJ's decision became final when the Appeals Council of the SSA's Office of Disability Adjudication and Review denied Plaintiff's request for review of the decision. (*Id.* at 1–6.) Thereafter, Plaintiff timely[2] commenced this action.

## II.   The ALJ Decision

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The claimant bears the burden of proof in the first four steps of the inquiry; the Commissioner bears the burden in the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the answer is yes, the claimant is not disabled. If the answer is no, the ALJ proceeds to the second step to determine whether the claimant suffers from a severe impairment.

---

[2] According to Title 42, United States Code, Section 405(g),

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42. U.S.C. § 405(g). "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the claimant makes a reasonable showing to the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)). Applying this standard, the Court determines that Plaintiff received the Commissioner's final decision on April 8, 2019, and that, because Plaintiff filed the instant action on May 22, 2019—44 days later—it is timely. (*See generally* Complaint, Dkt. 1.)

20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the impairment is not severe, then the claimant is not disabled.

In this case, the ALJ found that Plaintiff suffered from the following severe impairments: vertigo, arthralgia,[3] osteoarthritis, hypertension, enlarged prostate, kidney dysfunction, hematuria,[4] anemia, major depression, panic disorder, and anxiety disorder. (Tr., at 18 (citations omitted).) The ALJ then progressed to the third step and determined that Plaintiff's severe impairments did not meet or medically equal "the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)"—the "Listings." (*Id.*) Moving to the fourth step, the ALJ found that Plaintiff maintained the residual functional capacity ("RFC")[5] to perform

> medium work as defined in 20 CFR 404.1567(c) and 416.967(c),[6] with additional restrictions insofar as [Plaintiff] can never balance, operate a motor vehicle, work near hazards such as dangerous moving machinery or unprotected heights, or climb ladders, ropes, or scaffolds. He is otherwise capable of occasional crouching, stooping, and climbing of ramps and stairs. Despite his mental impairments, [Plaintiff] is capable of carrying out simple instructions and conveying simple information; he is capable of performing jobs in a low-stress setting, defined herein as work requiring no assembly line or fast-paced production requirements, with no more than occasional changes in the work routine or work setting, and requiring

---

[3] Arthralgia is "[p]ain in a joint." *See arthralgia*, Stedman's Medical Dictionary 75390 (Nov. 2014).

[4] Hematuria is the "[p]resence of blood or red blood cells in the urine." *See hematuria*, Stedman's Medical Dictionary 398600 (Nov. 2014).

[5] To determine the claimant's RFC, the ALJ must consider the claimant's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

[6] According to the applicable regulations, "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. §§ 404.1567(c), 416.967(c).

3

> little independent decision-making or goal setting; he is also capable of performing jobs involving only occasional or incidental contact with the public, and occasional interaction with co-workers and supervisors.

(*Id.* at 20.) Based upon the RFC finding, the ALJ determined that Plaintiff was capable of performing his past relevant work as a merchant patroller. (*Id.* at 25.) The ALJ also found that other jobs existed in the national economy that Plaintiff was able to perform, such as "cleaner II," "packager-hand," and "laborer." (*Id.* at 25–26.) The ALJ accordingly concluded that Plaintiff was not disabled. (*Id.* at 27.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera*, 697 F.3d at 151 (internal quotation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation and alterations omitted). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation omitted). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (noting that "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits [the court] to glean the rationale of an ALJ's decision" (internal quotation omitted)). Ultimately, the reviewing court "defer[s] to the

Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (citation omitted), and, "[i]f evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld[,]" *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (citation omitted).

## DISCUSSION

Plaintiff argues that (1) the ALJ failed to properly weigh the medical opinion evidence in determining Plaintiff's RFC, (2) the ALJ failed to properly evaluate Plaintiff's subjective statements of his limitations, and (3) the ALJ was not properly appointed pursuant to the Appointments Clause of Article II of the United States Constitution. (Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl.'s Mem."), Dkt. 16, at 14–31.) The Court finds that remand is warranted on the first two grounds.

I. **Medical Findings as to Plaintiff's Impairments**

A. **Treating Physician Rule**

As a preliminary matter, the Court notes that, "[w]ith respect to the nature and severity of a claimant's impairments, the SSA recognizes a treating physician rule[7] of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation and alterations omitted). Under the treating physician rule, a treating source's opinion is given "controlling weight" so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not

---

[7] Although "[t]he current version of the [Act]'s regulations eliminates the treating physician rule," the rule nevertheless applies to Plaintiff's claim, as the current regulations only "apply to cases filed on or after March 27, 2017." *Burkard v. Comm'r of Soc. Sec.*, No. 17-CV-290 (EAW), 2018 WL 3630120, at *3 n.2 (W.D.N.Y. July 31, 2018); *see also* 20 C.F.R. § 404.1520(c). Because Plaintiff's claim was filed on December 29, 2015, the treating physician rule applies.

5

"inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(c)(2). If the opinion of the treating physician is not given controlling weight, the ALJ must apply a number of factors in order to determine the opinion's proper weight. *See Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). These factors include: (i) the frequency of examination as well as the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating source's opinion; (iii) the extent to which the opinion is consistent with the record as a whole; (iv) whether the treating source is a specialist; and (v) other relevant factors. *See* 20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(c)(1)–(6). Courts in this Circuit "do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion[.]" *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2003).

### B. Plaintiff's Physical Impairments

In assessing Plaintiff's physical impairments, the ALJ reviewed treatment records and all opinion evidence pertaining to these impairments, including, *inter alia*, Plaintiff's hematuria, anemia, arthralgias, and vertigo. (Tr., at 21–22 (record citations omitted).) The ALJ concluded that "[t]he vast majority of [Plaintiff's] physical examinations, however, were generally unremarkable." (*Id.* at 22 (record citation omitted).)

On September 14, 2015, Plaintiff first saw his general practitioner, Nelson Eng., D.O., who diagnosed hypertension, anxiety/depression, opioid dependence, and hypertrophic cardiomyopathy,[8] and prescribed Amlodipine.[9] (*Id.* at 417, 422.) On February 29, 2016, Dr. Eng

---

[8] "Cardiomyopathy is a disease of the heart muscle. The heart loses its ability to pump blood (heart failure), and in some instances, heart rhythm is disturbed, leading to irregular heartbeats (arrhythmias)." 20 C.F.R. pt. 404, subpt. P, app. 1, § 4.00(H)(3).

[9] Amlodipine can be used for the treatment of high blood pressure. *See Amlodipine*, U.S. National Library of Medicine: Medline Plus, https://medlineplus.gov/druginfo/meds/a692044.html (last visited Sept. 20, 2020).

6

conducted a physical examination that revealed "mild generalized edema of the bilateral foot and ankles" and "[g]eneralized minimal swelling" of the hands. (*Id.* at 385, 388.) Dr. Eng substituted another medication for Amlodipine. (*Id.* at 387.) A March 25, 2016 X-ray showed degenerative changes of the DIP joints[10] in his left hand[11] and "unremarkable" results for his right hand. (*Id.* at 451–52.) On May 16, 2016, Dr. Eng noted that Plaintiff was in physical therapy and pending evaluation of intermittent vertigo and arthralgia. (*Id.* at 1068–69.) On May 23, 2016, Plaintiff continued to report lower leg pain from arthralgia despite physical therapy. (*Id.* at 1077.) On July 18, 2016, Plaintiff informed Dr. Eng and Maisah Shaikh, D.O., that his vertigo had worsened since starting Lisinopril.[12] (*Id.* at 1104.) On February 3, 2017, Dr. Shaikh evaluated Plaintiff for complaints of intermittent vertigo and chronic, constant pain in multiple joints that had not improved with physical therapy or Voltaren.[13] (*Id.* at 1151, 1155, 1157.) At a June 12, 2017 examination with Dr. Shaikh, Plaintiff's physical symptoms were unchanged, and Dr. Shaikh prescribed vestibular rehabilitation for treatment of vertigo. (*Id.* at 1164–65.)

Plaintiff saw rheumatologist David Engelbrecht, M.D., on November 1, 2016, describing symptoms of constant pain in his hands, ankles, and knees. (*Id.* at 1125.) Dr. Engelbrecht

---

[10] DIP joints are "the synovial joints between the middle and distal phalanges of the fingers and of the toes." *See distal interphalangeal joints (DIP)*, Stedman's Medical Dictionary 463420 (Nov. 2014). Synovial joints are, generally, joints that possess cavities. *See Clark v. Colvin*, No. 13-CV-01124 (MAT), 2016 WL 4804088, at *1 n.1 (W.D.N.Y. Sept. 13, 2016).

[11] Plaintiff is left-hand dominant. (*See id.* at 48, 446.)

[12] Lisinopril can be used alone or in combination with other medications to treat high blood pressure. *See Lisinopril*, U.S. National Library of Medicine: Medline Plus, https://medlineplus.gov/druginfo/meds/a692051.html (last visited Sept. 20, 2020).

[13] Voltaren is a non-prescription diclofenac topical gel, used to relieve pain from arthritis in joints such as the knees, ankles, feet, and hands. *See Diclofenac Topical (arthritis pain)*, U.S. National Library of Medicine: Medline Plus, https://medlineplus.gov/druginfo/meds/a611002.html (last visited Sept. 20, 2020).

conducted a physical examination and found "joint and diffuse tenderness in the DIP and PIP joints.[14]" (*Id.* at 1126, 1175.) On March 3, 2017, Plaintiff returned to Dr. Engelbrecht and reported "only very slight pain relief" on Voltaren and Tylenol, with ongoing pain involving his hands, knees, and ankles. (*Id.* at 1148.) At a September 30, 2017 examination, Plaintiff again reported various joint pain "of waxing and waning intensity" and stated that Naproxen gave him "moderate pain relief." (*Id.* at 1177.) Dr. Engelbrecht conducted an examination confirming "mild tenderness" in various joints and prescribed Naproxen "on an as needed basis" as well as Diclofenac gel. (*Id.* at 1177–78.)

In her RFC determination, the ALJ did not consider medical opinions from any of Drs. Eng, Shaikh, or Engelbrecht[15] because the record did not include functional assessments from those treating physicians. However, the record includes an April 14, 2017 Medical Source Statement from physiatrist Sudha Akkapeddi, M.D.,[16] in which she opined, *inter alia*, that Plaintiff could only sit for two hours, stand for 20-30 minutes, and walk for 15 minutes at one time without interruption; and could only sit for four, stand for one, and walk for one hour of an eight-hour work day. (*Id.* at 444–49.) Dr. Akkapeddi also noted that Plaintiff should not lift more than 20 pounds and listed various postural and environmental limitations. (*Id.* at 444.) The ALJ gave "little weight" to Dr. Akkapeddi's opinion and deemed it "entirely inconsistent with the overall record,

---

[14] PIP joints are "the synovial joints between the proximal and middle phalanges of the fingers and of the toes." *See proximal interphalangeal joints*, Stedman's Medical Dictionary 464230 (Nov. 2014).

[15] The ALJ's RFC determination also does not mention any treatment notes from Dr. Engelbrecht.

[16] While both the ALJ and Plaintiff have referred to Dr. Akkapeddi as Plaintiff's "treating" physician (*see* Pl.'s Mem., Dkt. 16, at 20; Tr., at 23), Dr. Akkapeddi appears only to have examined Plaintiff one time, on January 20, 2017 (*see* Tr., at 434–36). If this is so, Dr. Akkapeddi's opinion does not warrant deference pursuant to the treating physician rule. The record does not contain any additional treatment notes from Dr. Akkapeddi.

8

including clinical findings and objective tests;" "inconsistent with [Plaintiff's] degree of treatment, which has been conservative;"[17] inconsistent "with the lack of any documented treatment dating back to his alleged disability onset date;" and "inconsistent with [Plaintiff's] acknowledged ability to live independently, and his reported ability to sustain a living selling drugs for numerous years." (*Id.* at 23.)

After the ALJ effectively rejected the assessments of Drs. Akkapeddi and Shaikh,[18] the record lacked a medical opinion that addressed Plaintiff's physical impairments. While such an opinion is not necessarily required to support an RFC finding, *see, e.g., Corbiere v. Berryhill*, 760 F. App'x 54, 56–57 (2d Cir. 2019) (summary order) (affirming RFC determination that relied on medical findings in the treatment notes, despite the lack of a medical opinion expressly speaking to plaintiff's ability to undertake sedentary work), "an ALJ is not a doctor, and therefore is not equipped to make medical judgments," *Indelicato v. Colvin*, No. 13-CV-4553 (JG), 2014 WL 674395, at *3 (E.D.N.Y. Feb. 21, 2015). The ALJ "is not permitted to substitute [her] own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (citation omitted); *see also Dye v. Comm'r of Soc. Sec.*, 351 F. Supp. 3d 386, 391 (W.D.N.Y. 2019) ("An ALJ's determination

---

[17] To the extent Plaintiff received only "conservative" medical treatment, this Circuit is clear that an ALJ may not determine "that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered[.]" *Shaw*, 221 F.3d at 134–35.

[18] This opinion, limited only to a discussion of Plaintiff's vertigo, was in the form of a July 18, 2016 letter from Dr. Shaikh noting that Plaintiff was in treatment for vertigo and requesting that Plaintiff not be required to stand for prolonged periods of time, which exacerbated his vertigo symptoms. (Tr., at 428.) The ALJ accorded "no weight" to Dr. Shaikh's opinion on this issue and found that "there is little other evidence in the record to establish problems with prolonged standing, other than inconsistent findings of lower extremity edema with decreased range of motion." (*Id.* at 22.)

of RFC without a medical advisor's assessment is not supported by substantial evidence." (internal quotation omitted)).

Here, the ALJ determined that Plaintiff's physical examinations were "unremarkable" (Tr., at 22), despite the evidence to the contrary in Plaintiff's other medical treatment notes, and assigned little weight to the only medical source statement that addressed Plaintiff's physical limitations, that of Dr. Akkapeddi. This was error, especially in light of the subjective component of Plaintiff's particular symptoms. "Within the context of the disability analysis, [polyarthralgia] has been considered a subjective complaint/symptom of painful joints." *Gaathje v. Colvin*, No. 15-CV-01049 (VLB), 2017 WL 658055, at *11 (D. Conn. Feb. 17, 2017) (internal quotations omitted). Indeed, "'subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other objective medical evidence,' so long as the pain results from a 'physical or mental impairment' as defined by section 223(d)(3) of the Act." *Lim v. Colvin*, 243 F. Supp. 3d 307, 315–16 (E.D.N.Y. 2017) (citations omitted).

The ALJ also did not obtain or consider a medical opinion from one of Plaintiff's treating physicians familiar with Plaintiff's physical limitations. On remand, the ALJ should request a functional assessment from any one of Plaintiff's treating physicians—Drs. Eng, Shaikh, or Engelbrecht—so that the record contains a treating physician's medical opinion of Plaintiff's physical limitations. *See Stellmaszyk v. Berryhill*, No. 16-CV-9609 (DF), 2018 WL 4997515, at *24 (S.D.N.Y. Sept. 28, 2018) (noting that the lack of a function-by-function assessment by a treating physician can be a basis for remand if the record is not sufficiently comprehensive); *Nusraty v. Colvin*, 213 F. Supp. 3d 425, 442 (E.D.N.Y. 2016) (finding that, under his "affirmative duty" to develop the record, the ALJ "should have followed up with [the treating physicians] to request supporting documentation or to obtain additional explanations for [their] findings").

10

### C. Plaintiff's Mental Impairments

With regard to Plaintiff's mental impairments, the ALJ concluded that "the vast majority of [Plaintiff's] mental status examinations . . . were in fact essentially unremarkable, and [Plaintiff] was described several times as 'psychiatrically stable' on [his] current medication." (Tr., at 23–24 (record citations omitted).) The ALJ gave only "some weight" to the May 17, 2017 opinion of Plaintiff's treating nurse practitioner ("NP"), Claudia Melendez,[19] finding that NP Melendez's opinion as to Plaintiff's limitations was "not entirely supported by the record, including [Plaintiff's] prior work activity and the majority of unremarkable mental status examinations." (Id. at 24.)[20] The Court finds that the ALJ's conclusions regarding Plaintiff's mental impairments are not supported by substantial evidence.

In her May 17, 2017 psychiatric medical report, NP Melendez noted that Plaintiff presented with "panic disorder," "major depression," "generalized anxiety disorder," "opioid dependence on agonist therapy,"[21] "cocaine dependence in sustained remission," and "alcohol use disorder, moderate, in early remission." (Id. at 437.) NP Melendez indicated that Plaintiff was prescribed several medications, and she described Plaintiff as having "overproductive" speech, a "rapid, pressured thought process intact," "paranoid, depressive, preoccupied" thought content, and

---

[19] This report was also signed by Plaintiff's treating psychiatrist, Elishka Caneva, M.D. (Id. at 440.)

[20] The ALJ also accorded "no weight to Ms. Melendez' opinion that [Plaintiff] cannot work, as this is an issue reserved to the Commissioner." (Id. at 24.) On this issue, the ALJ was correct, as "the ultimate issue of disability is reserved to the Commissioner[.]" Parker v. Comm'r of Soc. Sec., No. 19-CV-7139 (RA) (SLC), 2020 WL 5044432, at *10 (S.D.N.Y. July 31, 2020).

[21] "Opioid agonist therapy refers to the treatment of an opioid dependency, such as heroin, with the controlled use of methadone, a drug meant to prevent withdrawal and reduce cravings for opioids." Lopez v. Comm'r of Soc. Sec., No. 18-CV-07564 (JGK) (SDA), 2020 WL 364861, at *1 n.1 (S.D.N.Y. Jan. 4, 2020) (citation omitted).

11

auditory and visual hallucinations. (*Id.* at 437.) She also described him as having "affect full range" with "mood congruent, [] anxious and depressed." (*Id.* at 438.) NP Melendez's functional assessment noted that Plaintiff had "difficulty walking, [that] public transportation cause[d] panic attacks, [that he had] low interest and pleasure in doing things," and that he suffered from "anger management issues [and] social withdrawal." (*Id.* at 439.) NP Melendez separately noted that Plaintiff "[could] easily decompensate" in a work setting. (*Id.*)

On September 18, 2015,[22] Plaintiff met with Licensed Clinical Social Worker ("LCSW") Benjamin Rosenberg to "begin [a] mental health assessment," at which LCSW Rosenberg noted that Plaintiff had an "unremarkable" mood, "appropriate" affect, and "cooperative" attitude, and diagnosed Plaintiff with major depressive disorder, recurrent episode, mild. (*Id.* at 289–90.) At a subsequent examination, Rosenberg observed the same and also noted as diagnoses "alcohol abuse, in remission;" "cocaine abuse in remission;" "heroin abuse;" and "opioid abuse, unspecified." (*Id.* at 297–98.) On December 22, 2015, psychiatrist Pik Sai Yung, M.D., evaluated Plaintiff and noted his history of polysubstance abuse and that he was on a methadone maintenance program. (*Id.* at 349.) On February 9, 2016, Dr. Yung noted Plaintiff to have a "euthymic" mood,[23] "cooperative" attitude, and "normal" activity, and found that "[Plaintiff] is psychiatrically stable on current medication." (*Id.* at 380–81.)

---

[22] The Court does not credit the ALJ's conclusion that "[Plaintiff's] lack of treatment [for mental impairments] prior to 2015" somehow supports the RFC determination. (*Id.* at 24.) In the same part of her decision, the ALJ noted that 'Plaintiff also has a long (40+ year) history of alcohol and drug abuse, with essentially minimal episodes of sobriety until June 2015, when [Plaintiff] appears to have attained sobriety with methadone maintenance." (*Id.* (record citations omitted).) Plaintiff also testified at the hearing that he did not become aware of his mental health impairments until he stopped using heroin in June 2015. (*Id.* at 65, 69–70.)

[23] Euthymia is "[m]oderation of mood, not manic or depressed." *See euthymia*, Stedman's Medical Dictionary 307600 (Nov. 2014).

Plaintiff's symptoms varied over subsequent examinations. On September 24, 2016, Dr. Caneva noted that Plaintiff had "rapid" speech, "anxious and depressed" mood, and "tangential" thought process, and she directed Plaintiff to continue his medications but to consider switching to an SSRI and Seroquel.[24] (*Id.* at 732.) She also noted that he had a "cooperative" attitude, "euthymic" mood, and "intact" thought process. (*Id.*) In a mental health assessment on November 10, 2016, Plaintiff had an "unremarkable" mood and "appropriate" affect, although he reported to Licensed Mental Health Clinician ("LMHC") Catherine Valencia that, over the prior two weeks, he felt "down, depressed, or hopeless" nearly every day, experienced racing thoughts, and was "irritable." (*Id.* at 769–71.) On November 16, 2016, Constance Mennella, D.O., noted that Plaintiff wanted Seroquel for insomnia but was advised not to take Seroquel in combination with methadone. (*Id.* at 756.) On December 6, 2016 and January 23, 2017, Dr. Mennella prescribed and then discontinued Ambien, and noted that Plaintiff showed "normal" activity, "cooperative" attitude, a "euthymic" mood, and "full" affect. (*Id.* at 777–78, 800–01.)[25] On February 15, 2017, LMHC Valencia noted that Plaintiff appeared "within normal limits," had an "unremarkable" mood, and "appropriate" affect, although Plaintiff reported "agitation, nervous[ness]/[anxiety], depressed mood, loss of energy, sleep disturbance, hyperactivity and impulsivity." (*Id.* at 817.)

On February 23, 2017, NP Melendez noted that Plaintiff had "accelerated and agitated" activity, "over productive and rapid" speech, a "cooperative" attitude, and an "anxious" mood. (*Id.* at 825.) Despite being "compliant with medication," Plaintiff reported experiencing agitation

---

[24] Selective serotonin reuptake inhibitors (SSRIs) are used to treat depression and anxiety. Seroquel is an antipsychotic used to treat major depression and bipolar disorder. *Grant v. Comm'r of Soc. Sec.*, No. 18-CV-5973 (KAM), 2020 WL 2836768, at *12 n.7 (E.D.N.Y. June 1, 2020).

[25] On January 23, 2017, Dr. Mennella noted that Plaintiff presented with disability paperwork, but she did not feel comfortable completing it because she had not seen him enough. (*Id.* at 801.)

13

almost every day, nervousness/anxiety all the time, depressed mood all the time, sleep disturbance, disruptive behavior almost every day, and anxiety/panic attacks several times a week. (*Id.*) Plaintiff saw LMHC Valencia again on April 7, 2017 and reported compliance with medication as well as continuing "agitation, nervous[ness]/[anxiety], depressed mood, loss of energy, difficulty with concentration, sleep disturbances, hyperactivity and impulsivity." (*Id.* at 841.)[26] On May 17, 2017, Plaintiff reported the same to NP Melendez, including anxiety/panic attacks almost every day, agitation almost every day, nervousness/anxiety most of the time, and problematic paranoia. (*Id.* at 854.) He also reported compliance with his medication. (*Id.*) NP Melendez noted that Plaintiff had "accelerated" activity, "over productive and rapid" speed, an "anxious and depressed" mood, and "appropriate" affect. (*Id.* at 855.) On June 20, 2017, Plaintiff reported many of the same symptoms, and NP Melendez noted that Plaintiff "acknowledge[d] that his symptoms are not under control," but was "reluctant to consider any additional medication or dose changes on current medications." (*Id.* at 886.) NP Melendez indicated that Plaintiff exhibited "normal" activity, "clear" speech, an "anxious and depressed" mood, and "appropriate" affect. (*Id.* at 887.)

On October 16, 2017, Plaintiff saw psychiatric-mental health NP Shauna Roach and reported experiencing "at times" nervousness/anxiety, depressed mood, and sleep disturbance. (*Id.* at 933.) NP Roach noted "normal" activity, "cooperative" attitude, "appropriate" affect, and "intact" thought process. (*Id.*) On December 15, 2017, Plaintiff reported having a depressed mood often, "moderate" hopelessness and worthlessness, and NP Roach again noted "normal" activity, a "cooperative" attitude, "appropriate" affect, and "intact" thought process. (*Id.* at 965–66.)

---

[26] LMHC Valencia documented additional progress notes on August 8, 2017 (*id.* at 903–04), September 26, 2017 (*id.* at 918–19), October 10, 2017 (*id.* at 925–26), October 24, 2017 (*id.* at 942–43), November 7, 2017 (*id.* at 949–50), December 19, 2017 (*id.* at 974–75), and January 16, 2018 (*id.* at 982–83), at which Plaintiff generally reported the same symptoms.

14

Based on the record evidence summarized above, the Court cannot find that the ALJ's decision to accord only "some weight" to the opinion of NP Melendez is supported by substantial evidence. (*Id.* at 24.) Where a plaintiff's mental health is at issue, "the treating physician rule takes on added significance . . . ." *Bodden v. Colvin*, No. 14-CV-08731 (SN), 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015); *accord Velez v. Berryhill*, No. 17-CV-06551 (BCM), 2018 WL 4609110, at *9 (S.D.N.Y. Sept. 25, 2018). "Interviewing a patient and assessing [his] subjective self-reported symptoms can be an acceptable clinical diagnostic technique when the condition complained of involves a substantial subjective component." *Martinez v. Colvin*, No. 15-CV-01596 (RA) (JCF), 2016 WL 3681426, at *10 (S.D.N.Y. June 15, 2016) (internal quotations omitted), *report and recommendation adopted sub nom. Martinez v. Comm'r of Soc. Sec.*, No. 15-CV-1596 (RA), 2016 WL 3685092 (S.D.N.Y. July 6, 2016). Thus, Plaintiff's reports at his mental status examinations of, *inter alia*, feeling anxious, experiencing hallucinations, and suffering from panic attacks while being compliant with his medication should not have been discounted in assessing NP Melendez's treatment notes and medical opinion based on those notes. *See Burgess*, 537 F.3d at 128 ("Medically acceptable clinical and laboratory diagnostic techniques include consideration of a patient's report of complaints, or history, as an essential diagnostic tool." (citation omitted)).

The Court also finds that the ALJ's conclusion that Plaintiff had "unremarkable mental status examinations" is not supported by substantial evidence. (Tr., at 24.) While there are numerous treatment notes over the course of Plaintiff's two-year history describing his affect as "appropriate" and his mood as "unremarkable," they are far outweighed by notations regarding Plaintiff's feelings of depression and lethargy, as well as his panic, anxiety, and thought disorders—which he admitted to NP Melendez in June 2017 were not in control despite

15

compliance with his medications. "It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports [her] determination." *Beckers v. Colvin*, 38 F. Supp. 3d 362, 374–75 (W.D.N.Y. 2014) (internal quotation omitted). Moreover, while Plaintiff's treatment notes indicate that he was compliant with his medications, the notes do not necessarily indicate that Plaintiff's medications improved his symptoms of anxiety, panic attacks, or depression. *See Collins v. Berryhill*, No. 16-CV-6673 (PKC), 2018 WL 259282, at *7 (E.D.N.Y. Jan. 2, 2018) ("[T]here is no medical basis for the ALJ's conclusion that [these] medication[s] sufficiently manage[] Plaintiff's [] anxiety to a degree where he can perform work-related functions." (citation omitted)). Even if Plaintiff's condition was at times stable while he was compliant with his various and changing prescriptions, this clearly should not be taken as evidence that his condition was not serious or that his mental impairments did not inhibit his functioning. *See Sierra v. Comm'r of Soc. Sec.*, No. 17-CV-10197 (KMK) (PED), 2018 WL 7681060, at *21 (S.D.N.Y. Dec. 6, 2018) (noting that the treating psychiatrist's "treating notes stating that [p]laintiff was often 'stable,' do not necessarily mean that [p]laintiff was improving or no longer suffering from a disabling mental impairment"), *report and recommendation adopted sub nom. Sierra v. Berryhill*, No. 17-CV-10197 (KMK), 2019 WL 1259168 (S.D.N.Y. Mar. 19, 2019).

Accordingly, based on the discussion *supra*, the Court finds that the ALJ erred in weighing the medical opinion evidence and that her RFC determination is not supported by substantial evidence. The Court concludes that remand is warranted on this basis.

## II.  Plaintiff's Subjective Statements and Self-Reported Functionality

In making her RFC determination, the ALJ stated that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence of record." (Tr., at 21.) The Court finds that remand is also

16

warranted because the ALJ improperly discounted Plaintiff's subjective complaints of pain and self-reported limitations in his functionality.

"The ALJ must follow a two-step process to evaluate a claimant's assertions of pain and other symptoms." *Cabassa v. Astrue*, No. 11-CV-1449 (KAM), 2012 WL 2202951, at *13 (E.D.N.Y. June 13, 2012). "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (alteration omitted) (citing 20 C.F.R. § 404.1529(a)). At the second step, the ALJ

> must consider statements the claimant or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts at work, or any other relevant statements [he] makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

*Villegas Andino v. Comm'r of Soc. Sec.*, No. 18-CV-1780 (PKC), 2019 WL 4575364, at *5 (E.D.N.Y. Sept. 19, 2019) (quoting *Genier*, 606 F.3d at 49). "The issue is . . . whether [P]laintiff's statements about the intensity, persistence, or functionally limiting effects of [his] pain are consistent with the objective medical and other evidence." *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010) (citations omitted).

At his hearing before the ALJ, Plaintiff testified as to his impairments of "anxiety, major depressive disorder with psychotic features," and "vertigo, arthralgia, osteoarthritis, high blood

17

pressure, and pancytopenia.[27]" (*Id.* at 55.) Plaintiff testified that he did not do work around the house because it was "hard for [him] to move." (*Id.* at 57.) Plaintiff stated that he had "problems taking the bus or train" because of "anxiety" and "panic attacks" (*id.* at 52, 88), and that he had one of his roommates accompany him when he took public transportation due to a fear of falling because of vertigo, the pain of walking with osteoarthritis, and not "do[ing] well in crowds" (*id.* at 87). Plaintiff testified that he had panic attacks roughly every other week and that they were more manageable when he was at home. (*Id.* at 88–89.) Plaintiff also testified that his medications did not always work. (*See id.* at 59 (noting that Plaintiff stopped taking Naproxen for pain caused by osteoarthritis and arthralgia because it did not help).) Plaintiff also noted that his pain from osteoporosis affected his ability to work (*id.* at 73) and that he did not "have energy to get out of bed" and was "always tired" as a result of his anemia and pancytopenia (*id.* at 89). Plaintiff testified that the medications prescribed by his psychiatrist only "ma[d]e [him] more drowsy" and did not otherwise work, despite modifications to his doses. (*Id.* at 91.)[28] Plaintiff generally testified that he did not "like the way [the medications] ma[d]e [him] feel," as they rendered him less "aware" and "alert" (*id.* at 92), and made him feel "down, feel sleepy, feel drowsy" (*id.* at 93).

The ALJ erred in discounting Plaintiff's testimony as to his limitations. "An individual can perform [his] daily activities and still experience debilitating pain at the intensity and persistence and with the limiting effects [he] claims." *Larsen v. Astrue*, No. 12-CV-00414 (CBA), 2013 WL 3759781, at *3 (S.D.N.Y. July 15, 2013) (citations omitted). "[This] Circuit has

---

[27] Pancytopenia is a "[p]ronounced reduction in the number of erythrocytes, all types of leukocytes, and the blood platelets in the circulating blood." *See pancytopenia*, Stedman's Medical Dictionary 646930 (Nov. 2014).

[28] Plaintiff maintained that he continued to take these medications because they are "the best ones to take – you know, the ones that aren't either addictive or that give you a positive on a toxicology [test] . . . ." (*Id.* at 91.)

18

repeatedly recognized that [a] claimant need not be an invalid to be found disabled." *Colon v. Astrue*, No. 10-CV-3779 (KAM), 2011 WL 3511060, at *14 (E.D.N.Y. Aug. 10, 2011) (internal quotation omitted). "Indeed, it is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Cabibi v. Colvin*, 50 F. Supp. 3d 213, 238 (E.D.N.Y. 2014) (internal quotation omitted).

While an ALJ is not "required to credit [a plaintiff's] testimony about the severity of [his] pain and the functional limitations it cause[s]," *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008) (summary order), the ALJ does not have unbounded discretion in choosing to reject it and must determine whether a Plaintiff's statements as to his pain are consistent with the objective medical evidence, *see Correale-Englehart*, 687 F. Supp. 2d at 435. Here, Plaintiff testified about having severe difficulties performing the most basic activities of daily living, such as working around the house (*id.* at 56), taking a bus or train (*id.* at 52, 87–88), being around crowds (*id.* at 87), and even getting out of bed (*id.* at 89). Plaintiff's statements regarding the subjective effects of both his physical and mental impairments are not inconsistent with the objective and other evidence of record, as shown by his treatment notes and medical opinions discussed *supra*.

Accordingly, the Court concludes that the ALJ committed reversible error where she discounted Plaintiff's hearing testimony as to the limiting effects of his physical and mental impairments in order to support her RFC determination, and finds that remand is also warranted on this basis.

### III. The ALJ's Authority

Citing, *inter alia*, *Lucia v. SEC*, 138 S. Ct. 2044 (2018), Plaintiff argues that ALJ Pellegrino was not properly appointed to her position pursuant to Article II of the United States Constitution.

(Pl.'s Mem., Dkt. 16, at 26–31.)[29]  In *Lucia*, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" subject to the Appointments Clause, and noted that the "'appropriate remedy' for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official" and not the prior ALJ, "even if he has by now received (or receives sometime in the future) a constitutional appointment." *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder v. United States*, 515 U.S. 177, 183, 188 (1995)).  Following *Lucia*, on July 16, 2018, the then-Acting SSA Commissioner ratified the appointments of SSA ALJs and "approved those appointments as her own."  Soc. Sec. Ruling 19-1P, 2019 WL 1324866, at *2 (Mar. 15, 2019) (footnote omitted).  Accordingly, the ALJ who hears Plaintiff's case on remand will have been properly appointed pursuant to *Lucia*, mooting this issue.  *See Piorkowski v. Comm'r of Soc. Sec.*, No. 18-CV-3265 (FB), 2020 WL 5369053, at *2 (E.D.N.Y. Sept. 8, 2020).

## CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion.  The Commissioner's decision is remanded for further consideration consistent with this Memorandum and Order.  The Clerk of Court is respectfully requested to enter judgment and close this case accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 26, 2020
        Brooklyn, New York

---

[29] Plaintiff notes that, "should the Court remand this case based on [Plaintiff's other arguments], [that decision] will render this issue moot."  (*Id.* at 26.)  The Court nevertheless summarizes this argument in brief.

20